DOMINGO DOMÍNGUEZ MALDONADO y EDNA SANTIAGO ORTIZ, demandantes y recurrentes, *v.* ESTADO LIBRE ASOCIADO DE PUERTO RICO y OTROS, demandados y recurridos.

*Número:* RE-92-251          *Resuelto:* 9 de febrero de 1995

*Rafael A. Nadal Arcelay*, de *Cancio, Nadal & Rivera*, abogado de la recurrente; *Anabelle Rodríguez, Procuradora General, Reina Colón de Rodríguez, Subprocuradora General*, y *Grisel Hernández Esteves, Procuradora General Auxiliar*, abogadas de los recurridos.

La Juez Asociada Señora Naveira de Rodón emitió la opinión del Tribunal.

I

La Sra. Edna Santiago Ortiz y el Sr. Domingo Domínguez Maldonado otorgaron capitulaciones matrimoniales, el 14 de marzo de 1962, antes de contraer nupcias. En dichas capitulaciones matrimoniales, las partes acordaron "que no rija la sociedad económica de gananciales en el matrimonio a celebrarse entre ellos, según se ha dicho anteriormente, no rigiendo, desde luego, en cuanto a bienes futuros". Sin embargo, no indicaron bajo cuál régimen económico se regirían una vez contraído el matrimonio. La pareja se casó el 17 de marzo de 1962.

Veintiséis (26) años después, el 22 de agosto de 1988, los esposos Domínguez Maldonado y Santiago Ortiz presentaron ante el Tribunal Superior, Sala de San Juan, una petición de sentencia declaratoria. En ésta solicitaron que se reconociera, desde la fecha en que contrajeron matrimonio, la existencia de una sociedad legal de bienes gananciales. Alegaron que a pesar de haber otorgado capitulaciones matrimoniales en la que descartaron la existencia de una sociedad de bienes gananciales, desde el inicio de su matrimonio actuaron como si estuvieran regidos por dicho régimen. Señalaron que "[c]oetáneamente, y con posterioridad al otorgamiento de las Capitulaciones Matrimoniales y a la celebración del matrimonio entre ambos ... otorgaron en o alrededor de cuarenta (40) documentos públicos dispositivos de bienes inmuebles". Además, solicitaron que, de

ser necesario, se decretara la inconstitucionalidad de los Arts. 1267, 1269, 1271 y 1272 del Código Civil de Puerto Rico, 31 L.P.R.A. secs. 3551, 3553, 3555 y 3556, sobre el contrato sobre bienes con ocasión del matrimonio. Basaron su alegación de inconstitucionalidad en que "[a]l igual que el divorcio por mutuo acuerdo, la mutabilidad de las capitulaciones matrimoniales hecha sin coacción, bajo el principio de autonomía de la voluntad debe tener un claro reconocimiento en nuestra Constitución", bajo el Art. II, Secs. 1 y 8 de la Carta de Derechos, Const. E.L.A., L.P.R.A., Tomo 1.

También solicitaron que, en caso de que el tribunal de instancia no reconociera el régimen legal de bienes gananciales durante el matrimonio, se decretara, en la alternativa, la existencia de una comunidad de bienes atípica con participación por partes iguales de los cónyuges en los bienes adquiridos durante el matrimonio.

El 2 de abril de 1992, el tribunal de instancia dictó una sentencia parcial al amparo de la Regla 43.2(d) de Procedimiento Civil, 32 L.P.R.A. Ap. III, desestimando en su totalidad las alegaciones "de invalidez, por inconstitucional u otra causa, contra la legislación que permite las capitulaciones en general y en particular la que gobernó al Sr. Domingo Domínguez y ahora gobierna en la partición". De dicha sentencia parcial la demandante, señora Santiago Ortiz, interpuso un recurso de revisión.(¹) Como único señalamiento de error plantea que:

> Erró el tribunal de instancia al negarse a reconocer la existencia de una sociedad legal de gananciales y/o comunidad atípica existente de hecho entre el Sr. Domingo Domínguez Maldonado y la Sra. Edna Santiago Ortiz durante la vigencia de su matrimonio y al sostener la validez constitucional de la ley sustantiva que permite el otorgamiento de contrato sobre bienes con ocasión del matrimonio conocido como Capitulaciones Matrimo-

---

(¹) Compareció únicamente la Sra. Edna Santiago Ortiz por razón de haber fallecido su esposo, el Sr. Domingo Domínguez Maldonado.

niales, para regir en forma diferente a la sociedad de gananciales la relación económica de la pareja que así escoja y contrate.

Visto el recurso presentado, ordenamos a la parte demandada recurrida mostrar causa por la cual no deberíamos expedir el recurso presentado, revocar la sentencia recurrida dictada el 2 de abril de 1992, por el Tribunal Superior, Sala de San Juan, y devolver el caso al foro de instancia para que celebrase una vista evidenciaria sobre lo referente a las capitulaciones matrimoniales. Presentado el escrito de la parte demandada recurrida, estamos en posición de resolver y así procedemos a hacerlo sin ulteriores procedimientos.

## II

■ Nuestro Código Civil, siguiendo un sistema contractual, reglamenta los intereses pecuniarios que surgen del matrimonio en las relaciones de los cónyuges y en las relaciones con terceros. Permite a las parejas otorgar capitulaciones matrimoniales *antes* de contraer nupcias, disponiendo que los novios podrán estipular las condiciones de la sociedad conyugal referente a los bienes presentes y futuros sin otras limitaciones que las impuestas por la ley, la moral y el orden público. Art. 1267 del Código Civil, 31 L.P.R.A. sec. 3551.

■ Aun cuando las capitulaciones matrimoniales constituyen un contrato sujeto al régimen de libertad que impera en nuestro sistema de contratación, la autonomía de la voluntad de las partes no es absoluta. *Umpierre v. Torres Díaz*, 114 D.P.R. 449 (1983); *Ab Intestato Saldaña*, 126 D.P.R. 640 (1990).(²) Sobre las limitaciones que se imponen a la libertad de estipular en el contrato de capitulaciones

---

(²) En este último caso, nuestro Tribunal limitó la autonomía de estipular, al concluir que el usufructo viudal no puede ser renunciado en las capitulaciones matrimoniales.

matrimoniales, Manresa señala como pactos prohibidos los siguientes: (1) los contrarios a la naturaleza y a los fines del matrimonio, a la libertad y los derechos del individuo o, en general, a la moral y a las buenas costumbres; (2) los que contravienen los preceptos legales de carácter prohibitivo o imperativo, y (3) los que sean depresivos de la autoridad que respectivamente corresponde en la familia a los futuros cónyuges. J.M. Manresa y Navarro, *Comentarios al Código Civil Español*, 6ta ed. rev., Madrid, Ed. Reus, 1969, T. IX, Vol. 1, pág. 141.

█ Indica Albaladejo que: "[P]ueden contener acuerdos relativos a la gestión por cada esposo de sus bienes propios, y a la intervención en ellos del otro, y establecer donaciones por razón del matrimonio. La libertad del pacto en las capitulaciones no tiene más límite que el no poder estipularse (y estipulado, será nulo) nada contrario a las leyes, a las buenas costumbres, ni a los fines del matrimonio". (Citas omitidas.) M. Albaladejo, *Compendio de Derecho Civil*, 3ra ed., Barcelona, Ed. Bosch, 1976, págs. 516–517. Véase, además, J. Castán Tobeñas, *Derecho Civil español, común y foral*, 11ma ed., Madrid, Ed. Reus, 1987, T. V, Vol. I, págs. 331–332.

█ El contrato de capitulaciones matrimoniales es de primordial importancia en el ámbito de la relación patrimonial del matrimonio, ya que puede regular: "los derechos de los esposos sobre sus bienes respectivos, los derechos sobre las ganancias realizadas por ellos durante su unión; los intereses de los hijos y de la familia; los intereses de los terceros que contratan con uno u otro de los esposos, y, en definitiva, el interés económico y social, muy afectado por la solución que se dé a los problemas que el régimen matrimonial lleva consigo". Castán Tobeñas, *op. cit.*, pág. 309. Por lo tanto, aunque el propósito fundamental de realizar un pacto de capitulaciones matrimoniales es establecer el régimen económico que ha de imperar en el

matrimonio, este tipo de contrato puede tener otras finalidades ajenas al régimen económico conyugal.

■ En Puerto Rico rige la doctrina de la inmutabilidad de las capitulaciones matrimoniales. El Art. 1271 del Código Civil, 31 L.P.R.A. sec. 3555, dispone claramente que "[p]ara que sea válida cualquier alteración que se haga en las capitulaciones matrimoniales, deberá tener lugar antes de celebrarse el matrimonio y con la asistencia y concurso de las personas que en aquéllas intervinieron como otorgantes". Por otra parte, el Art. 1272 del Código Civil, 31 L.P.R.A. sec. 3556, expresamente prohíbe que se modifiquen las capitulaciones luego de celebrado el matrimonio.

■ En *Vilariño Martínez v. Registrador*, 88 D.P.R. 288, 293 (1963), explicamos que las razones para exigir que el contrato de capitulaciones se otorgue antes de la celebración del matrimonio son "que los interesados están en condiciones de prestar libremente su consentimiento para tal otorgamiento; y ... que los terceros puedan conocer el régimen adoptado y las estipulaciones convenidas partiendo de una época fija, después de la cual no puede haber alteración". Según aceptamos en *Umpierre v. Torres Díaz*, supra, pág. 458, "[l]a razón del principio de inmutabilidad ... de que 'a través de los pactos postnupciales, pudiera uno de los cónyuges, generalmente la mujer, quedar sometido, en su perjuicio, al influjo psicológico del otro, sin llegar a manifestar su voluntad en condiciones, de plena libertad', ha perdido virtualidad en nuestros tiempos. El pensamiento moderno se orienta hacia reconocer la igualdad entre las personas de sexos opuestos, sin que pueda señalarse que ninguna es per se más fuerte o más débil de voluntad que la otra. Además, de ser la persona de un sexo más débil que la otra, ello sería razón de igual peso para desechar el principio de inmutabilidad, en vez de afianzarlo, pues la falta de voluntad o la voluntad viciada puede ocurrir antes del casamiento y no necesariamente después". (Escolio omitido.)

Ciertamente, la doctrina de la inmutabilidad de las capitulaciones matrimoniales ha caído en desuso y ha sido abolida en los más modernos códigos. *Umpierre v. Torres Díaz*, supra, pág. 457. De hecho, las últimas leyes civilistas sobre capitulaciones matrimoniales han acogido la mutabilidad del régimen económico matrimonial. Castán Tobeñas, *op. cit.*, pág. 316. Por ejemplo, los códigos de Alemania y Suiza permiten la celebración y modificación en cualquier tiempo después del matrimonio e instituyen un registro especial de contratos matrimoniales. El código de Méjico permite que el contrato matrimonial pueda ser concluido o modificado durante el matrimonio y la ley chilena autoriza a los esposos a transformar por documento notarial la comunidad de adquisiciones en separación de bienes. La ley holandesa autoriza el otorgamiento de capitulaciones matrimoniales durante el matrimonio luego de tres (3) años desde su celebración y con autorización judicial. La ley francesa autoriza a los cónyuges a cambiar de sistema de bienes después de dos (2) años de haber sido adoptado, en documento notarial y con la homologación del Tribunal de Gran Instancia. Así también el Código Civil italiano permite la modificación de las capitulaciones matrimoniales bajo control judicial. En el derecho belga se autoriza el cambio postnupcial de régimen económico en carta notarial, acompañada de un inventario de los bienes y derechos y la liquidación del régimen preexistente homologada por el Tribunal de Primera Instancia. En España, las leyes de 2 de mayo de 1975 y de 13 de mayo de 1981, permiten que la pareja pacte las capitulaciones en cualquier momento anterior a la celebración del matrimonio y variarlas en cualquier momento, cuántas veces lo deseen.[3]

---

[3] Cabe señalar, que la preocupación fundamental de los opositores al principio de mutabilidad es que al permitirse que los cónyuges puedan modificar lo pactado en capitulaciones se perjudiquen con ello los acreedores. De hecho, esta preocupación aún subsiste en España, a pesar de que ya se legisló para adoptar el principio de mutabilidad. C. Vázquez Iruzubieta, en el libro *Régimen Económico del Matrimonio*, Madrid, Ed. Edersa, 1982, págs. 150–151, comenta:

También el *Uniform Premarital Agreement Act*, 9B *Uniformed Laws Anntated (U.L.A.)* Sec. 5, preparado por *The National Conference of Commissioners on Uniform State Laws*, incluye en la Sec. 5 una disposición para permitir que un contrato prenupcial de capitulaciones sea modificado o revocado. Todos los estados, excepto Montana y Nueva Jersey, tienen cláusulas similares. S.C. Mercing, *The Uniform Premarital Agreement Act: Survey of Its Impact in Texas and Across the Nation*, 42 Baylor L. Rev. 825, 869 (1990).

■ Sin embargo, en Puerto Rico, contrario a las nuevas tendencias en las jurisdicciones civilistas, el legislador no ha tomado acción para acoger el principio de la mutabilidad, y continúa vigente la prohibición del Art. 1272, *supra*. Precisamente, uno de los principales argumentos esgrimidos por el Procurador General, en su escrito en cumplimiento de nuestra orden para mostrar causa, es que los países que han abolido el principio de la inmutabilidad lo han hecho mediante legislación y han establecido sistemas que protegen los intereses de terceros. Así lo reconocimos en *Umpierre v. Torres Díaz*, supra, pág. 459, donde afirmamos que para adoptar el principio de mutabilidad en esta jurisdicción se requiere la acción legislativa.

La parte recurrente impugna la validez constitucional de las disposiciones del Código Civil respecto a la inmutabilidad de las capitulaciones. Sin embargo, por no ser ne-

---

"Es aquí sitio apropiado para insistir que si el legislador ha optado por abandonar el sistema de la inmutabilidad de las capitulaciones permitiendo a los cónyuges modificar el régimen matrimonial cuantas veces lo deseen, no ha obrado en consecuencia con la garantía que demandan los terceros para una fluidez basada en la seguridad del tráfico comercial, al dejar vacuo el sitio de un Registro de bienes del matrimonio que funciona en todos aquellos países donde impera el régimen de la mutabilidad. Un Registro apropiado que no es, naturalmente, el Registro Civil, para que los particulares y básicamente los comerciantes acudan a averiguar a qué régimen patrimonial se encuentran sujetos los cónyuges que van a pactar con él, o quién es el administrador de sus bienes o cuanta [sic] información pronta, exhaustiva y eficaz pueda proporcionar un Registro de cualidades especiales para la atención de estas cuestiones patrimoniales y no el del estado civil de las personas. Pensamos que se ha cometido un serio error con esta omisión, no corregida aún, y al parecer sin intención confesada de que pueda ser corregida."

cesario para adjudicar la controversia, no entraremos a discutir este señalamiento de error.([4])

## III

■ Bajo la libertad de pacto provista por el Código Civil, aun pactando capitulaciones matrimoniales, una pareja puede optar por: (1) la separación de bienes pero con participación en las ganancias; (2) la sociedad de gananciales, para lo cual basta con guardar silencio y no estipular nada o estipularlo expresamente, que tampoco está prohibido; (3) renunciar al régimen legal de gananciales; (4) la total separación de bienes, o (5) elegir cualquier otro régimen que combine estas posibilidades, siempre que no infrinja las leyes, la moral o las buenas costumbres. C. Vázquez Iruzubieta, *Régimen Económico del Matrimonio*, Madrid, Ed. Edersa, 1982, págs. 150–151. Véase, además, Castán Tobeñas, *op. cit.*, págs. 331–332.

En el caso de autos, los esposos Domínguez Maldonado y Santiago Ortiz capitularon para descartar el régimen de sociedad de bienes gananciales, expresando específica-

---

([4]) Hemos sostenido que un tribunal tiene que hacer lo posible para evitar los dictámenes precipitados en cuestiones constitucionales y, sobre todo, debe decidir esas cuestiones sólo cuando no pueda disponer de otra manera del caso ante su consideración. *Milán Rodríguez v. Muñoz*, 110 D.P.R. 610, 619 (1981).

En nuestra jurisdicción los planteamientos constitucionales no pueden abordarse cuando un caso pueda resolverse: (1) mediante un análisis estatutario válido; (2) en armonía con los criterios de las partes y en consonancia con los mejores fines de la justicia; (3) al existir una interpretación razonable de la legislación que permita soslayar la cuestión constitucional presentada, y (4) porque la controversia puede quedar resuelta definitivamente por otros fundamentos. *P.P.D. v. Admor. Gen. de Elecciones*, 111 D.P.R. 199, 243 (1981); *Molina v. C.R.U.V.*, 114 D.P.R. 295 (1983); *Galarza Soto v. E.L.A.*, 109 D.P.R. 179, 180 esc. 7 (1979); *Pacheco v. Srio. Instrucción Pública*, 108 D.P.R. 592, 601 (1979); *Mari Bras v. Alcaide*, 100 D.P.R. 506, 513 (1972); *Calderón, Rosa-Silva & Vargas v. García*, 120 D.P.R. 803, 811–812 (1988); *E.L.A. v. Aguayo*, 80 D.P.R. 552, 596 (1958); *Vives Vázquez v. Tribunal Superior*, 101 D.P.R. 139, 150 (1973).

Por lo tanto, nos reafirmamos en que de favorecerse la doctrina de la mutabilidad de las capitulaciones le corresponde al legislador estudiar el asunto y legislar al respecto. "[E]s misión que primordialmente recae en la Asamblea Legislativa el regular los efectos económicos del matrimonio y el divorcio." *Ripoll Alzuru v. Rosa Pagán*, 121 D.P.R. 1, 16 (1988).

mente que no existiría la sociedad económica de gananciales durante su matrimonio. Sin embargo, no indicaron cuál régimen económico regiría su unión.

■ Contrario al Código Civil de España, nuestro Código no establece cuál régimen económico rige cuando en unas capitulaciones matrimoniales se indica expresamente que no existirá una sociedad legal de gananciales, pero se omite escoger un régimen patrimonial para regular las relaciones económicas de los cónyuges. En España, el Código dispone que, en tal caso, regirá el llamado régimen supletorio de segundo grado, que es el de separación de bienes. Explica Castán Tobeñas en su tratado sobre *Derecho Civil Español*, que el Art. 1.435, numeral 2, del Código Civil español dispone "que existirá entre los cónyuges separación de bienes cuando hubieren pactado en capitulaciones matrimoniales que no regirá entre ellos la sociedad de gananciales, sin expresar las reglas por [las] que hayan de regirse sus bienes". Castán Tobeñas, *op. cit.*, págs. 305–306. Según Vázquez Iruzubieta, no cabe otra solución "posible" y "coherente", ya que "quien no quiere la comunidad debe aceptar la separación". Vázquez Iruzubieta, *op. cit.*, pág. 38. Manresa, por su parte, reconoce la posibilidad de la existencia de la sociedad de gananciales cuando no se estipula en las capitulaciones régimen alguno y no se ha excluido expresamente dicho régimen. Manresa, *op. cit.*, pág. 178.

Según la parte peticionaria, nuestro Código Civil limita el sistema de separación de bienes a lo expresado en las capitulaciones matrimoniales, de acuerdo con el Art. 1327 (31 L.P.R.A. sec. 3711). Nos invita a juzgar los actos coetáneos y posteriores al contrato para interpretar la intención de las partes y a estudiar si la relación entre los esposos Domínguez Santiago se rige por el contrato de sociedad o comunidad de bienes. Fundamenta sus reclamos en el caso *Umpierre v. Torres Díaz*, supra, donde nos apartamos de la

tradición española respecto a la omisión de la estipulación de un régimen económico en unas capitulaciones. Veamos.

En el caso *Umpierre v. Torres Díaz*, supra, pág. 459, las partes otorgaron las capitulaciones matrimoniales para identificar los bienes privativos que cada uno aportaba al matrimonio, " 'para que al liquidarse la sociedad conyugal le sea reconocido y satisfecho' ". Se reconoció en la escritura la potestad de cada cónyuge de administrar sus propios bienes y de realizar todo tipo de negocio con cargo a dichos bienes. *No escogieron un régimen económico que dispusiera sobre los bienes futuros.* Después de casarse, hicieron uso de los bienes y los administraron como si pertenecieran al caudal común, aportando trabajo y esfuerzo personal. Dijimos que no se variaron las capitulaciones matrimoniales ya que en éstas no se estipuló que cada cónyuge tendría la administración exclusiva de sus bienes y que realizarían toda clase de negocios con la exclusión del otro. Distinto al caso de autos, los cónyuges no se obligaron a mantener una separación absoluta de sus bienes y de los frutos de éstos. La sociedad de gananciales no fue descartada y, por los actos de los cónyuges, cobró vigencia por su propio efecto supletorio.

No podemos acoger el planteamiento de la peticionaria en el sentido de que surgió una sociedad de gananciales porque durante el matrimonio de Domínguez Maldonado y Santiago Ortiz, éstos realizaron actos de administración y esfuerzo común, ya que *expresamente* pactaron que no deseaban crear un régimen ganancial. Decir lo contrario sería variar jurisprudencialmente la doctrina de la inmutabilidad de las capitulaciones matrimoniales. Otra cosa sería si, como en *Umpierre v. Torres Díaz*, supra, en el contrato no se hubiese determinado el régimen económico que los interesados deseaban y, además, se probara que la pareja usó y administró los bienes como si su matrimonio estuviese regido por una sociedad

de ganaciales, en las que ambos aportaban esfuerzo y trabajo personal.

## IV

Luego de analizar el derecho vigente en materia del régimen patrimonial del matrimonio y, en específico, el de las capitulaciones matrimoniales, nuestro sentido e idea de la justicia nos impiden despachar el caso de autos sin considerar otros aspectos que tocan la institución del matrimonio y los derechos de la mujer. Recordemos que " '[l]a equidad ... implica más que una justicia abstracta una justicia individualizada, y más que una justicia estrictamente legal, una justicia de tipo natural y moral'". Castán Tobeñas, según citado en *Cruz Cruz v. Irizarry Tirado*, 107 D.P.R. 655, 660 (1978). La equidad, como se sabe, quiere decir algo que es justo. *Silva v. Comisión Industrial*, 91 D.P.R. 891, 898 (1965). No es justo ni lógico que, siendo la institución del matrimonio una favorecida por nuestro ordenamiento, *Cosme v. Marchand*, 121 D.P.R. 225, 234 (1988), no le ofrezcamos a la esposa que aporta trabajo y esfuerzo la misma protección que a la concubina respecto a los bienes adquiridos en el caso de una comunidad de bienes. Veamos.

En el pasado hemos reconocido "el interés propietario de los concubinos con respecto a los bienes adquiridos o que hayan incrementado de valor vigente la relación, como resultado del esfuerzo, labor y trabajo aportados conjuntamente bajo cualquiera de las siguientes alternativas: '(1) como pacto expreso ... (2) como pacto implícito que se desprende espontáneamente de la relación humana y económica existente entre las partes durante el concubinato ... (3) como un acto justiciero para evitar el enriquecimiento injusto ...' ". *Ortiz de Jesús v. Vázquez Cotto*, 119 D.P.R. 547, 548–549 (1987). Véanse: *Caraballo Ramírez v. Acosta*, 104 D.P.R. 474, 481 (1975); *Cruz v. Sucn. Landrau Díaz*, 97 D.P.R. 578, 585 (1969). Ahora bien, se tiene que probar que

se aportó esfuerzo y trabajo para producir o aumentar el capital objeto de la reclamación del concubino. *Caraballo Ramírez v. Acosta*, supra.

En el caso de autos, los esposos Domínguez Maldonado y Santiago Ortiz capitularon para descartar el régimen de sociedad de gananciales. No indicaron cuál régimen económico regiría durante su unión. Como señalamos antes, no podemos acoger el planteamiento de que la sociedad de gananciales surgió por los actos de administración y esfuerzo común de ambos cónyuges. Sin embargo, cabe examinar la alegación de la peticionaria sobre la existencia de una comunidad de bienes atípica con participación por partes iguales de los cónyuges en los bienes adquiridos durante el matrimonio.

La peticionaria señaló que la pareja otorgó alrededor de cuarenta (40) documentos públicos dispositivos de bienes inmuebles y que ella laboró junto a su difunto marido en la empresa que éste fundara. Sin embargo, en los autos del caso ante nos, no encontramos prueba alguna conducente a fundamentar la alegación sobre la existencia de una comunidad de bienes. No basta una mera alegación de la peticionaria de que existe una comunidad de bienes. La peticionaria tiene que demostrar que, a pesar de no existir una sociedad de gananciales, ella trabajó, brindó servicios y se esforzó durante el matrimonio para acrecentar el capital privativo de su cónyuge.(⁵) Por lo tanto, si la

---

(⁵) Aunque no es el caso para dilucidar cómo valorar las tareas, las responsabilidades y los servicios de la mujer, tomamos conocimiento de que dichas tareas y servicios son vitales para la salud del régimen económico de un matrimonio. De hecho, y como regla general, las tareas del hogar no son valoradas en términos monetarios. Pero dichas tareas, que incluyen, entre muchas, cuido de niños, limpieza del hogar, labores de cocina, lavado, planchado, actividades misceláneas del hogar, compras, diligencias y servicios relacionados a asuntos de los niños y el esposo, y, de acuerdo con la posición económica y social de la familia, actividades sociales y de entretenimiento, representan actividades laborales mercadeables. Además, relevan al marido de tareas cotidianas para que éste pueda concentrarse en su trabajo. Por lo tanto, el valor económico de los servicios realizados en un hogar por la esposa ama de casa deberá ser, junto con las contribuciones económicas de cualesquiera de los dos cónyuges, consideradas al tomar decisiones sobre la división y distribución de bienes

peticionaria recurrente logra demostrar esto, deberá entenderse que entre los cónyuges surgió una comunidad de bienes. Resolver lo contrario sería ignorar la doctrina de enriquecimiento injusto sobre la cual hemos señalado que, "basada en la equidad, es aplicable para hacer justicia a una parte, en ausencia de una obligación contractual o legal de parte de la otra". *Umpierre v. Torres Díaz*, supra, pág. 462. Como explican Planiol y sus continuadores:

La *vida común* engendra necesariamente una cierta *confusión de intereses*: los bienes resultan mezclados, se adquieren nuevos elementos patrimoniales y se realizan gastos en interés del hogar. Aun en el caso de que los esposos hayan decidido establecer entre ellos una separación de bienes, habrá que resolver cuestiones de prueba de propiedad o de contribución a las cargas del matrimonio. Será el régimen más o menos complejo, pero se impone siempre como una inevitable necesidad. (Énfasis en el original.) Planiol-Ripert-Boulanger, según citado por Castán Tobeñas, *op. cit.*, pág. 279.

En fin, históricamente el Derecho ha sido instrumento forjador de cambios sociales. A través de la ley y de la jurisprudencia, se le ha facilitado a la mujer puertorriqueña la oportunidad de luchar por posiciones de igualdad y res-

---

de un matrimonio. Véanse M.H. Minton y J.L. Block, *What Is a Wife worth?*, Nueva York, Ed. William Morrow Co., 1983; B.F. Kiker, *Divorce Litigation: Valuing the Spouses' Contributions to the Marriage*, 16 (Núm. 12) Trial 48 (1980); B.F. Kiker, *Evaluating Household Services*, 16 (Núm. 2) Trial 34; R.P. Wolf, *Assessing the Value of Household Services*, 22 (Núm. 10) Trial 81 (1986); R.B. Siegel, *Home as Work: The First Woman's Rights Claims Concerning Wives' Household Labor, 1850–1880*, 103 Yale L.J. 1073 (1994). *Cf. Mundo v. Cervoni*, 115 D.P.R. 422, 426 (1984), donde señalamos que:

"Fundada la prestación alimenticia en la solidaridad familiar y en el derecho a la vida del alimentista, es amplísimo el concepto de 'alimentos' que el Código Civil define en su Art. 142 como 'todo lo que es indispensable para el sustento, habitación, vestido y asistencia médica, según la posición social de la familia'. Tanto contribuye a alimentar los hijos el padre que suministra con regularidad determinada suma de dinero, como la madre que con su labor y energía realiza el propósito y destino de la pensión al preparar y servir la comida a sus hijos, al mantener la casa limpia y ordenada, al llevarlos a la escuela para su educación, y al médico si se enferman. No hay base moral ni jurídica para concluir que una madre que así se conduce falta al deber de alimentar sus hijos no emancipados que le impone el Art. 153, ni puede menospreciarse su aportación física y anímica al sustento de sus hijos reduciéndola a cero, llegado el momento de liquidación de gananciales, y dándole un crédito contra ella al marido porque no contribuyó proporcionalmente con dinero." (Énfasis suprimido.)

peto en diversas áreas, sociales, económicas y familiares.[6] Por lo tanto, ante una situación de desbalance, y a pesar de la inexistencia de una sociedad legal de gananciales, un tribunal no puede desatender los reclamos de una mujer envuelta en el quehacer económico de su cónyuge, con la salvedad de que dichos reclamos sean probados.

En virtud de lo anteriormente expresado, *modificamos la sentencia parcial dictada por el Tribunal Superior, Sala de San Juan, el 2 de abril de 1992 para que éste pueda celebrar una vista evidenciaria de manera que la peticionaria pueda presentar prueba sobre su solicitud de que se decrete la existencia de una comunidad de bienes entre ésta y el extinto señor Domínguez Maldonado y, de determinarse que ésta existió, también pueda presentar prueba de los bienes de la misma para poder hacer la división que corresponda. Se devuelve el caso para continuar con los procedimientos a tenor con lo dispuesto en esta opinión.*

El Juez Asociado Señor Negrón García emitió una opinión disidente, a la cual se unió el Juez Asociado Señor Hernández Denton. El Juez Asociado Señor Rebollo López disintió sin opinión escrita.

---

[6] Véanse, entre otros: O.E. Resumil de Sanfilipo, *La condición jurídica de la mujer puertorriqueña en el siglo XX: ¿Continuamos interpretando la parte de la leona?*, 54 Rev. C. Abo. P.R. 5 (1993); E. Vicente, *Las mujeres y el cambio en la norma jurídica*, 56 Rev. Jur. U.P.R. 585 (1987); I. Picó Vidal, *Derecho de familia y cambio social: Una interpretación histórico-social de la reforma de la administración de los bienes gananciales*, 55 Rev. Jur. U.P.R. 537 (1986).

— O —

Opinión disidente del Juez Asociado Señor Negrón García, a la cual se une el Juez Asociado Señor Hernández Denton.

## I

La decisión mayoritaria es una interpretación jurídicamente insostenible que encierra consustancialmente una insalvable contradicción: de un lado articula un discurso apologético de los derechos de la mujer y, del otro, en términos prácticos, les inflige una ruda estocada al dejar completamente subordinados sus intereses a los del marido.

Sucintamente resuelven que si en una escritura pública de capitulaciones matrimoniales los futuros contrayentes se limitan *exclusivamente* a rechazar el régimen económico de sociedad de gananciales, *sin fijar uno alterno*, automáticamente rige la separación de bienes. Para arribar a esta conclusión aplican un precepto del Código Civil *español* descartado desde principios de siglo por el legislador puertorriqueño.(¹) Bajo ese cuestionable predicado, devuelven el caso al tribunal de instancia para que determine si existió entre la peticionaria Edna Santiago Ortiz y su finado marido Domingo Domínguez Maldonado una comunidad de bienes. Ese camino es desacertado en Derecho y, más lamentable aún, *INJUSTO*.

## II

Los que se unan en matrimonio podrán otorgar sus capitulaciones antes de celebrarlo, *estipulando las condiciones de la*

---

(¹) Cabe aclarar que, en su origen, el artículo en cuestión del código español no proveía para el régimen de separación de bienes en el supuesto del rechazo de la sociedad de gananciales. Disponía entonces que se seguirían las reglas referentes a la dote.

> *sociedad conyugal relativamente a los bienes presentes y futuros*, sin otras limitaciones que las señaladas en este título.
> *A falta de contrato sobre los bienes, se entenderá el matrimonio contraído bajo el régimen de la sociedad legal de gananciales.*" (Énfasis suplido.) Art. 1267 del Código Civil, 31 L.P.R.A. sec. 3551.

Como todo contrato, su existencia presupone consentimiento de los contratantes, *objeto* cierto y causa. Art. 1213 del Código Civil, 31 L.P.R.A. sec. 3391. Y en el capitular, el *objeto* es "fijar las condiciones de la sociedad conyugal relativamente a los bienes, esto es, determinar los efectos que va a producir el matrimonio con relación a los bienes, marcar las relaciones patrimoniales entre los cónyuges y con respecto a terceros, *y precisar las reglas que han de regir en la asociación conyugal en cuanto a los bienes afecta*". (Énfasis suplido.) J.M. Manresa y Navarro, *Comentarios al Código Civil Español*, 6ta ed., Madrid, Ed. Reus, 1969, T. IX, Vol. 1, pág. 121.

La doctrina exige que se establezca en las capitulaciones unas reglas *precisas* y *claras* sobre el régimen económico matrimonial. Sin esas reglas adviene supletoriamente el régimen de la sociedad legal de gananciales, pues el Legislador puertorriqueño ha querido que así se presuma, *no otro*. La deseabilidad de ese tratamiento como sistema económico primario matrimonial se trasluce del extenso y detallado articulado de nuestro Código Civil que delinea los perfiles de dicha figura jurídica.

Por esta razón no podemos resolver el caso de autos importando un *siglo más tarde*, vía judicial, unas interpretaciones basadas en las dos (2) alternativas codificadas por el legislador español si los futuros contrayentes únicamente se limitan a rechazar el régimen de gananciales, sin fijar el que ha de regir. Con oportunidad de hacerlo, ¿por qué el legislador puertorriqueño nunca ha incorporado un artículo de similar solución a nuestro Código Civil? Más que una laguna, ¿no demuestra ello una voluntad legislativa de no avalar ese enfoque?

Ante estos antecedentes, la lógica y el sentido común nos mueve a interpretar que la Asamblea Legislativa expresó su voluntad de no seguir igual ruta cuando sólo se rechaza la sociedad de gananciales. De ese modo, dejó constancia de una valoración social distinta, consistente en no dar eficacia jurídica a dicha posibilidad en nuestro ordenamiento. En otras palabras, no permitió como causa suficiente en un contrato capitular el mero rechazo de la sociedad de gananciales. Estamos ante la ausencia de dicho contrato o, como consigna Manresa, uno *deficiente*. Es un acto de legislación impermisible adoptar el texto del Código Civil español. Corresponde a la Asamblea Legislativa, no a este Foro, esa u otra solución, incluso incorporar el más moderno concepto de mutabilidad de las capitulaciones matrimoniales.

Ante esta realidad aplica el Art. 1267 de nuestro Código Civil, 31 L.P.R.A. sec. 3551, a los efectos de que sin capitulaciones, rige la sociedad de gananciales.

### III.

La situación es más grave, carentes de eficacia unas capitulaciones que se limitan a rechazar el régimen ganancial, y vigente éste, no cabe hablar de separación de bienes. Primero, el articulado de *nuestro* Código Civil pertinente a la separación de bienes([2]) parte de la premisa inarticulada de que aplicará a situaciones extraordinarias o anormales

---

([2]) Los artículos que recogen en esencia los supuestos en que aplicará el régimen de separación de bienes son:

"[Art. 1327] A falta de declaración expresa en las capitulaciones matrimoniales, la separación de bienes entre los cónyuges durante el matrimonio no tendrá lugar sino en virtud de providencia judicial." 31 L.P.R.A. sec. 3711.

"[Art. 1328] El marido y la mujer podrán solicitar la separación de bienes, y deberá decretarse, cuando el cónyuge del demandante hubiera sido condenado a una pena que lleve consigo la interdicción civil, o hubiera sido declarado ausente, o hubiese dado causa al divorcio.

"Para que se decrete la separación, bastará presentar la sentencia firme que haya recaído contra el cónyuge culpable o ausente en cada uno de los tres (3) casos expresados." 31 L.P.R.A. sec. 3712.

que implican un distanciamiento físico o emocional entre los cónyuges.

[D]ichas normas se producen para resolver situaciones anormales dentro del matrimonio. Y, otra posible solución existente en distintos ordenamientos, el recurso a las normas que en ellos se contienen acerca de la separación legal *no tiene cabida en Derecho puertorriqueño, en que dicha separación carece de regulación.* De ahí que como criterio demasiado vago sólo pueda recogerse la disposición general del art. 92 (pensado, dicho sea de paso, para situaciones muy distintas), que responde a un pensamiento de independencia en la administración, dominio y aprovechamiento, al cual debe añadirse un principio de proporcionalidad en las cargas comunes. (Énfasis suplido.) E. Vázquez Bote, *Tratado teórico, práctico y crítico de derecho privado puertorriqueño*, New Hampshire, Equity Publishing Co., 1973, T. XI, pág. 204.

Y segundo, "[l]a tramitación de la separación se produce siempre a instancia de parte (arts. 50, párrafo segundo; 1.327 y sigs., C.c.)". Vázquez Bote, *op. cit.*, pág. 205.

Ello, sin embargo, no ha ocurrido en el caso de autos. Todo lo contrario, las partes solicitaron al tribunal que se les reconociera la gananciabilidad, que a fin de cuentas es la expresión económica que nuestro legislador ha entendido encarna mejor los postulados de armonía y la más saludable convivencia en el seno matrimonial.

## IV

La voluntad del legislador puertorriqueño de limitar la aplicación de régimen de separación de bienes a los casos ya señalados y el propósito de no dar su sanción si sólo se rechaza el régimen de sociedad de gananciales, se ve más claramente al considerar los supuestos que al *presente* el legislador ibérico ha querido extender la separación de bienes. Así, el Art. 1.435 del Código Civil español puntualiza:

Existirá entre los cónyuges separación de bienes:

1.° Cuando así lo hubiesen convenido.

2.° *Cuando los cónyuges hubieren pactado en capitulaciones matrimoniales que no regirá entre ellos la sociedad de gananciales, sin expresar las reglas porque hayan de regirse sus bienes.*

3.° Cuando se extinga, constante matrimonio, la sociedad de gananciales o el régimen de participación, salvo que por voluntad de los interesados fuesen sustituidos por otro régimen distinto.

Sabemos que el legislador puertorriqueño ha tenido ante sí, como modelos, el texto original y este nuevo catálogo de supuestos; sin embargo no ha actuado como ahora la mayoría pretende; esto es, reconocerle eficacia jurídica al solo rechazo de la sociedad de gananciales. La disposición que más se aproxima en nuestro Código dispone que "[a] falta de declaración *expresa* en las capitulaciones matrimoniales, la separación de bienes entre los cónyuges durante el matrimonio *no* tendrá lugar sino en virtud de providencia judicial". (Énfasis suplido.) 31 L.P.R.A. sec. 3711.

Difícilmente puede argumentarse que el mero rechazo de la sociedad de gananciales es el tipo de declaración expresa que exige nuestro ordenamiento para que se reconozca la separación de bienes. Si el legislador español hubiera entendido que el rechazo a la sociedad de gananciales equivale a una "declaración expresa", ¿por qué delinear bajo un acápite distinto la situación del rechazo a la sociedad de gananciales? Ausente dicha declaración, no puede este Tribunal valerse de la "providencia judicial"; hemos visto que sólo se activa rogadamente (a instancia de parte).

Finalmente, resulta interesante que el precepto legal nuestro —que exige una declaración expresa para que se reconozca la separación de bienes— es cónsono con la letra del derogado Art. 1.432 del Código Civil español, respecto al cual comentaba Castán:

... En relación con la forma expresa de pactarlas, la sentencia de 27 de junio de 1974 declaró no ser preciso que se mencione en la escritura la palabra "separación, bastando que la intención de los contratantes se deduzca del conjunto de las estipu-

laciones, y de los actos anteriores *y posteriores* de aquéllos".
(Énfasis suplido.) J. Castán Tobeñas, *Derecho Civil español, co-
mún y foral*, 10ma ed., Madrid, Ed. Reus, 1987, T. V, Vol. 1.

Bajo esta óptica, si algún significado tuvieron en vida
los actos posteriores de los esposos Domínguez Maldonado-
Santiago Ortiz fue expresar abiertamente la intención de
unir sus patrimonios, no separarlos.

# V

Por último, aunque advino *de jure* una sociedad de ga-
nanciales, no podemos pasar por alto la injusta y errónea
conclusión mayoritaria de que no hay ninguna prueba que
apoye la conclusión, siquiera, de que existió una comuni-
dad de bienes. Nos dicen que "[l]a peticionaria tiene que
demostrar que, a pesar de no existir una sociedad de ga-
nanciales, ella trabajó, brindó servicios y se esforzó du-
rante el matrimonio para acrecentar el capital privativo de
su cónyuge". Opinión mayoritaria, pág. 968.

De este modo ignoran la declaración jurada suscrita
conjuntamente en vida de su marido que acompañó a su
solicitud de sentencia declaratoria. Ésta, pletórica en seña-
lamientos de actos que configuran como mínimo una comu-
nidad de bienes, sintetiza muy bien su existencia así:

> Además de haber realizado los anteriores negocios jurídicos
> mediante los cuales adquirimos por partes iguales las propie-
> dades antes descritas y nos obligamos, también por partes
> iguales, al constituir las hipotecas aquí indicadas, yo, DO-
> MINGO DOMINGUEZ MALDONADO, utilicé el consejo de mi
> esposa, EDNA SANTIAGO ORTIZ, desde los inicios de nuestra
> relación matrimonial, en la mayoría de las decisiones tomadas
> por mí en la administración de nuestros negocios, en la compra
> de las propiedades muebles e inmuebles y otros bienes de di-
> versa naturaleza tanto para el comercio como para el hogar.
> Ambos, hemos aportado por partes iguales esfuerzo y trabajo
> para el desarrollo de nuestros bienes familiares de naturaleza
> comercial y familiar, incluyendo las Empresas Domingo Domín-

guez, Inc. y Como lo Hace, Inc., compartiendo por partes iguales las ganancias. *Exhibit* III, pág. 22.

Distinto a la conclusión mayoritaria, esta prueba es suficiente para concluir prima facie que hubo la relación económica y humana (estuvieron casados por veintisiete (27) años), demostrativa de que "se obligaron implícitamente a aportar, y aportó cada una bienes, esfuerzo y trabajo para beneficio común". *Caraballo Ramírez v. Acosta*, 104 D.P.R. 474, 481 (1975). Revela que ella aportó a los bienes comunes por lo menos en igual proporción que su marido fallecido. Compete a la parte contraria probar que la participación de la peticionaria es inferior al cincuenta por ciento (50%). *Caraballo Ramírez v. Acosta*, supra, pág. 484.